NOTICE
Decision filed 09/05/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240443-U

NO. 5-24-0443

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Union County. |
| | ) | |
| v. | ) | No. 19-CF-169 |
| | ) | |
| BRADLEY D. MATHUS, | ) | Honorable |
| | ) | Jeffery B. Farris, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Cates and Hackett[*] concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's judgment is affirmed where the evidence was sufficient to prove defendant guilty. The defendant's claim of ineffective assistance of counsel fails where he failed to establish deficient performance.

¶ 2    Following a bench trial, the defendant, Bradley D. Mathus, was convicted of two counts of aggravated domestic battery in violation of section 12-3.3(a-5) of the Criminal Code of 2012 (Code) (720 ILCS 5/12-3.3(a-5) (West 2018)) and five counts of endangering the life or health of a child in violation of section 12C-5(a)(1) of the Code (*id.* § 12C-5(a)(1)). He was sentenced to 48 months of probation on the aggravated domestic battery convictions and 12 months of probation on each of the child endangerment convictions, to be served concurrently. On appeal, the defendant

_____

[*]Justice Welch participated in oral argument. Justice Hackett was later substituted on the panel and has read the briefs and listened to the recording of oral argument.

1

contends that the State failed to prove him guilty beyond a reasonable doubt where the witness testimony was inconsistent, based on assumptions rather than personal knowledge, and contrary to the common experience. The defendant also contends he was deprived of a fair trial where the State improperly presented evidence of other bad acts without having filed an appropriate motion or the trial court weighing the prejudicial effect versus the probative value of that evidence. For the following reasons, we affirm.

¶ 3                                  I. BACKGROUND

¶ 4     On July 2, 2019, the defendant was charged by indictment with two counts of aggravated domestic battery (*id.* § 12-3.2(a)(1)) and five counts of endangering the life or health of a child (*id.* § 12C-5(a)(1)). Count I alleged the defendant knowingly caused bodily harm to Stephanie Allison Mathus by strangling her by placing his arm around her neck, applying pressure to her neck, and impeding her normal breathing or blood circulation. Count II charged the defendant with the same conduct against H.G.W., a minor. Counts III-VII alleged that he knowingly endangered the life or health of five minor children in that he pointed a loaded firearm at each child. The defendant waived his right to a jury trial, and the matter proceeded to a two-day bench trial that began on June 22, 2022.

¶ 5     At trial, Officer Adam Tripp testified that on June 29, 2019, at approximately 9:30 p.m., he was dispatched to the defendant's residence in response to an "open-line 911 call," which is a 911 call in which no one speaks but background noise can be heard. When he arrived at the residence, he knocked and heard what sounded like a loud pop, as if something was being struck. Officer Tripp could hear screaming and a male voice say something to the effect of "Shut the F up." The defendant opened the door, wearing only blue jeans, and stepped outside to speak to the officer.

2

¶ 6     After other officers arrived and secured the defendant, Officer Tripp went inside and spoke with the defendant's wife, Stephanie, and their minor children H.G.W., C.M.F., M.C.H.,[1] R.H.M., M.W., and M.M. The officer described the scene as chaotic, and he observed the individuals were "screaming and crying, very upset, very distraught." Someone told the officer that the gun the defendant had pulled on them was on the couch. Officer Tripp located a .45-caliber pistol under a pillow on the couch.

¶ 7     When Officer Tripp secured the gun, he discovered it was loaded, with four rounds in the magazine and one in the chamber, and it was operable, though not fully loaded. There was a tactical light on the gun which was a flashlight underneath the barrel of the weapon. It had a pressure pad which went under the middle finger and activated the flashlight when squeezed.

¶ 8     Stephanie described the events of the evening to Officer Tripp. According to Stephanie, the defendant had chased her and the children with a knife, broke the knife blade from its handle, slammed a gun down on a table, and pulled a gun on them. The officer seized the knife handle and viewed what he believed to be a knife stab mark in a dresser[2] in the downstairs bedroom, and he viewed a muzzle stamp on a table from a .45-caliber firearm. Stephanie took the officer upstairs to see "stuff that was in disarray" that the defendant had done, and the officer noted there were "things in various disarray" in the home. Officer Tripp recalled there was a broken television in the upstairs bedroom and the bed was messed up, but he could not recall if anything was strewn about on the floor. The downstairs was not in disarray, other than a knife stab mark in a child's desk where a knife blade had broken. The officer did not see marks on the necks or throats of Stephanie or H.G.W., and Stephanie did not appear to be intoxicated.

---

[1]At the time of trial, M.C.H. had a different last name, but for clarity, he will continue to be referred to as M.C.H. as he is listed in the indictment.

[2]During the trial, some witnesses referred to the object as a dresser and at other times as a shelf.

¶ 9      At trial, Stephanie Mathus Johnson testified that on June 29, 2019, she was married to the defendant. That evening, the couple decided to have a glass of wine with dinner, and the defendant was grilling out while the kids were playing. When dinner was ready, the defendant noticed that Stephanie had put a spoon in the wrong pot, and he called her "retarded and stupid." Stephanie testified that things escalated from there. The defendant started yelling and getting in her face, spitting on her face. Stephanie told the defendant to stop and pushed him off. He called her a bitch, kicked her in the thigh with his steel-toed boots, and shoved her onto the counter. Trying to act like everything was okay because the kids were watching, Stephanie went over to the kitchen counter and began to cut up pork chops with a knife. Stephanie testified that the defendant continued to taunt her and say mean things. When she turned and told him to stop, the defendant spun and flipped her, causing her to go over his shoulder and land hard on the floor, hurting her elbow. Her thumb was cut, and the defendant got on top of her with the knife in her face. She told the kids to run.

¶ 10      Stephanie was able to get up and she and the kids all ran into the kids' room, with the defendant chasing them, yelling that he was not crazy and that he was not her ex-husband, David. The defendant broke the knife blade from its handle when he stabbed it into a child's desk in the room. He told Stephanie to get out of the house, and she told him she would not leave the kids with him. The defendant grabbed Stephanie and tried to pull her off the bed, but she got free. M.W. was holding on to her. Stephanie told the defendant he was worse than her ex-husband. He said "You haven't seen crazy" as he grabbed her daughter, H.G.W. and put his arm around H.G.W.'s neck. Stephanie testified that while he had his arm around her neck, H.G.W. was grabbing onto his arm, trying to say "Mom," but she could not talk. The defendant fell over with H.G.W. still in his arm, and H.G.W.'s head hit the side of a dresser, resulting in H.G.W. having to see a doctor

4

for headaches and ringing in her ear for a few months after the incident. The defendant told everyone to get out of the room, and the kids started leaving.

¶ 11  Stephanie's son, M.M., noticed that a container holding his grandmother's ashes had been knocked off the dresser when H.G.W. hit it, so Stephanie knelt down to look for the container. While she was on the floor, Stephanie felt the defendant's arm come around her neck, and he began choking her to the point she could not breathe. Stephanie testified that her ability to breathe was compromised although she did not pass out and did not have injuries on her neck. H.G.W. jumped on the defendant and hit him in the back to get him to let go of Stephanie. The defendant eventually let go, got his phone, and went outside to call his father.

¶ 12  Stephanie went back to the kitchen to get the kids their dinner so they could go to bed. The defendant was outside, talking to his father on the phone. She did not call 911 at that time because she believed he would calm down after talking to his father. At some point while the defendant was still outside, Stephanie went outside to talk to him. The defendant got mad at Stephanie and told her to go back inside, which she did.

¶ 13  A little later, the defendant came in and apologized. Stephanie was on the phone with the defendant's mom, telling her that the defendant was not okay and that she needed to come there. While still on the phone with the defendant's mother, Stephanie told the defendant he needed to admit what he had done. The defendant responded by shoving Stephanie into the bookcase, asking "Do you like breathing oxygen?" The defendant then said he was going to bed and went upstairs. Stephanie heard things breaking while the defendant was upstairs. She climbed part way upstairs and yelled at the defendant to stop, but he threw a fan at her so she went back downstairs. As she was heading back into the living room, Stephanie, who was a former air force security officer, heard the defendant "rack a round into the chamber" of the gun.

5

¶ 14    The defendant yelled at everyone to get into the living room, which they did. They were all in different seats on the couch. H.G.W. was with Stephanie and the defendant's youngest son, M.M. However, M.W. did not want to sit down, so the defendant put the gun to M.W.'s back and shoved him into the couch. H.G.W. attempted to call 911, but the defendant put the gun to her head and told her to put the phone down. Stephanie testified that the defendant "just kept yelling, and he kept aiming the gun at all of our heads. And he started counting, one, two, three, four, all the way till he got to him, eight. He said he was going to kill us." Without the defendant noticing, Stephanie dialed 911. She did not talk to the dispatcher and left the phone face down on the couch where the defendant could not see it.

¶ 15    Stephanie knew that the gun did not have a safety lock and that a laser came on when the trigger was pulled, showing where the gun was pointing. Stephanie saw the laser come on while the defendant slowly pulled the trigger and aimed at them, although the gun was not fired. After Stephanie called 911, the defendant kept yelling and aiming the gun at the kids, then at himself, saying he had just gone too far this time, and he was going to kill himself because he just wanted to die. The defendant told C.M.F. that his mother was a whore and she should have aborted him, and he told R.H.M. and M.W. that their mother was a whore. The defendant slammed the gun hard on the table as the police officer knocked on the door. The defendant put the gun behind a couch pillow and calmly answered the door.

¶ 16    On cross-examination, Stephanie testified that on June 29, 2019, she had been married to the defendant for about two months. Stephanie and the defendant had served in the armed forces, and she knew the defendant had PTSD. They went to couple's counseling, and the defendant was also getting counseling on his own. She and the defendant had been taking Wellbutrin for about a month to stop smoking but quit taking it five days prior so they could have wine. She had one glass of wine that day.

6

¶ 17 Defense counsel asked Stephanie about what had happened while she was looking for the ashes under the kids' bed. She stated the defendant put his arm around her neck in a chokehold and had restricted her breathing. She stated she did not know how long it was restricted, but it felt like forever. Stephanie was fearful and unable to breathe for a while. Stephanie testified that the defendant had his arm around her neck long enough to interfere with her breathing and cause panic, but not long enough to leave a mark. She stated the defendant let go of her because H.G.W. was hitting him and telling him to stop. Stephanie did not believe there were marks on H.G.W.

¶ 18 Defense counsel challenged Stephanie's testimony, asking why there was no swelling, red marks, or bruising on her neck if the defendant had put his arm around her neck and applied enough pressure that it interfered with her breathing. She responded: "It wasn't a long enough time to cause marks." Defense counsel asked, "I thought you said you didn't know how long it was?" and Stephanie answered: "I don't know how long it was, but it was long enough to cause panic. I have been choked by [the defendant] before where I had bruising all over my neck. So I know how long it takes." Defense counsel then asked when and where that incident occurred, whether Stephanie reported it, whether anyone saw it besides her, and whether bruises were caused then. Stephanie reported it had occurred in August 2017 in the bathroom of the same house, no report was made, and she took a few days off of work and then wore turtlenecks when she returned to work for a couple of days because that time, there were bruises.

¶ 19 Turning back to the incident on June 29, 2019, defense counsel asked Stephanie why she did not leave and take the kids with her when the defendant was outside on the phone. She responded that she had nowhere to go. She thought the defendant was calming down so she did not call police. She testified that looking back, she should have called the police.

¶ 20 M.W. testified on behalf of the State. On June 29, 2019, M.W. was 14 years old. She was at home with her mother Stephanie, the defendant, H.G.W., M.C.H., C.M.F., M.M., and R.H.M.

7

She was in the kitchen and saw the defendant and Stephanie get into a fight about a spoon being in the wrong pot. The defendant got in Stephanie's face and yelled at her, calling her an idiot and "a dumb B word." The defendant shoved Stephanie against the counter as she was holding her arm up trying to get him out of her face. When Stephanie turned around and started cutting up pork chops, the defendant "took her arm and flipped her" and then took the knife out of her hand. Stephanie told the children to run.

¶ 21    They ran to the bedroom that M.W. and H.G.W. were sharing with M.C.H., which was next to the kitchen. The defendant chased them into the room, still holding the knife, and then he kept slamming the knife down onto M.C.H.'s table. M.W. was on one bed with Stephanie while M.C.H., the other boys, and H.G.W. were on the other bed. The defendant snapped the knife and took the blade off of it. He was "messing around with it" and threatening them, yelling "he'll show us crazy." The defendant asked Stephanie to get out, and when she refused, he started dragging her off the bed. M.W. started holding on to Stephanie, while H.G.W. started shoving the defendant, telling him to get off of Stephanie. The defendant put H.G.W. in a chokehold and fell backwards, and H.G.W. hit her head on a dresser. The defendant let H.G.W. go and went outside to call his father. While Stephanie was looking for the ashes that had fallen when H.G.W. hit the shelf, the defendant started choking Stephanie. She was down on her knees, and he had her in a chokehold with his arm around her neck, then he went back outside to call his parents.

¶ 22    When the defendant came back inside after the kids ate their food, he apologized and went upstairs. M.W. heard a loud bang upstairs. The defendant threw a fan at the stairs. The defendant came downstairs holding a gun which he put on a table. M.W. ran into the living room and heard the gun click "that sounded like when you push it back." The defendant started taking off his clothes but left his pants on. C.M.F. was the only one not in the room, and the defendant called

8

him into the living room. When he came into the room, the defendant threw a bottle at him, put the gun to C.M.F.'s back, and shoved him onto the couch next to M.W.

¶ 23　Everyone was on the couch, and the defendant started yelling, saying he was going to kill himself. H.G.W. picked up her phone and tried to call 911, but the defendant put the gun to her head and told her to put the phone on the floor. She put it on her lap, and he told her again to put it on the floor, so she did. M.W. saw a light on H.G.W.'s face after the defendant put his finger on the trigger of the gun.

¶ 24　She heard the defendant say he was going to kill them and then himself, and he counted their heads one by one. The defendant told C.M.F. that his mother never loved him and wanted to abort him. The defendant slammed the gun down onto the counter in front of the couches, and then the police knocked. The defendant put the gun under the pillow really quickly, calmed down quickly, and opened the door to greet the officer. M.W. put a blanket over her and M.C.H.'s heads because she did not want her brother to see the defendant shoot.

¶ 25　M.W. testified that the defendant and Stephanie were both drinking wine. Stephanie had one glass. When the defendant had H.G.W. in a chokehold, it was not too long before the defendant tripped and fell backwards. H.G.W. did not have marks on her neck. The defendant had Stephanie in a chokehold for less than a minute. M.W. did not see marks from that, but she heard Stephanie choking and gasping for air. She did not hear H.G.W. gasp. They did not leave or call the police when the defendant went back outside because they thought the defendant had calmed down, he said he was sorry, and they did not think he would bring out a gun.

¶ 26　M.W. knew the gun was loaded when the defendant walked into the living room because she heard the gun "clicking." The defendant put the gun to C.M.F.'s back to push C.M.F. to the couch. M.W. saw the light from the gun on H.G.W.'s face when the defendant told H.G.W. to put

9

the phone down. The defendant's finger was around the gun and pointed at H.G.W.'s head. M.W. had not talked about those events with her mother and her siblings.

¶ 27    H.G.W. testified on behalf of the State. On June 29, 2019, H.G.W. was 12 years old. She was at home with her mother Stephanie, the defendant, R.H.M., M.M., C.M.F., M.W., and M.C.H. While she was in her brother's room, she heard yelling and screaming. When she got to the kitchen, she saw the defendant shove Stephanie into the counter. Stephanie tried to ignore the defendant and started cutting up pork chops. When the defendant kept yelling in Stephanie's face, Stephanie turned around, and the defendant grabbed her wrist and flipped her upside down onto her back. He took the knife from her hand.

¶ 28    The kids and Stephanie ran into M.C.H.'s room, and the defendant followed them. The defendant shoved the knife into a dresser and kept yelling. The defendant told Stephanie to get out, but she refused. The defendant tried to pull Stephanie off the bed, and H.G.W. started hitting his back and telling him to stop. The defendant picked her up with her feet off the ground and choked her. She was unable to talk or say anything while he was choking her. She did not lose consciousness, but her breathing was affected. H.G.W. felt pressure on her neck, and she was trying to yell and tell him to let go but she could not. Her head got slammed into the dresser, injuring her ear and causing pain and constant headaches. After this, the defendant went outside to call his parents. The container with the ashes had fallen when H.G.W.'s head slammed into the bookshelf, and Stephanie was on the ground looking for them when the defendant came back and started choking Stephanie. H.G.W. and M.W. tried to get the defendant off of her.

¶ 29    Later, the defendant was on the phone, and then he went upstairs. H.G.W. heard "a lot of rummaging around," and the defendant threw a fan. Later, the defendant came back downstairs with a gun. He told everyone to go into the living room, and he sat them all down on the couch. While in the living room, H.G.W. heard the gun "click."

10

¶ 30    H.G.W. saw the defendant put the gun to C.M.F.'s back to shove him onto the couch. C.M.F. was 12 at that time, the same age as H.G.W. The defendant was numbering them off and counting each of their heads while waving the gun around. H.G.W. tried calling 911, but the defendant put the gun to her head and told her to put her phone down. She put it on her lap, but he told her to put it all the way on the ground so she slid it onto the floor. She saw a light come on when the gun was pointed at her head.

¶ 31    The defendant put the gun to himself and screamed "a bunch of hurtful things" at C.M.F. H.G.W. testified: "He was like going like this (indicating) and counting each of our heads." They were yelling back at him to stop, and the defendant slammed the gun straight down into the coffee table.

¶ 32    On cross-examination, H.G.W. testified that the defendant put his arm around her neck with the other arm locked while he lifted her off the ground and was pushing down on her neck choking her, but it did not cause bruises or marks. The defendant choked Stephanie for a little while as he kept telling Stephanie to say sorry. H.G.W. heard Stephanie tell the defendant she could not breathe. H.G.W. was unaware of marks on Stephanie's neck. The defendant did the same thing to Stephanie that he did to her, with one arm pushing down on the other. H.G.W. heard the gun being loaded while in the living room, short moments after the defendant came downstairs and took his shirt off, before the defendant started pointing the gun at all of their heads. She saw the light come on when the defendant was pulling down on the trigger a little bit.

¶ 33    M.C.H. testified on behalf of the State. M.C.H. was nine years old on June 29, 2019. He saw the defendant corner his mother, Stephanie, all up in her face, spitting and cursing at her. The defendant shoved Stephanie into the countertop. She tried to ignore him and was cutting a pork chop. He flipped her and grabbed the knife. Then he went to the bedroom, yelling at Stephanie to leave. When Stephanie refused to leave, the defendant started dragging her. M.W. pulled her back,

and H.G.W. started hitting the defendant, telling him to stop. The defendant started choking H.G.W. and slammed her into the dresser. He was "saying crazy stuff," and he started choking Stephanie and H.G.W. The defendant went outside, then went upstairs and started making "crashes, loud noises." The defendant came down with a gun.

¶ 34 M.C.H. saw the defendant throw a bottle at C.M.F., and it broke. He told C.M.F. to sit down, shoving him with the gun. The defendant said he was going to chop them up in pieces and hide them in the basement, and he counted their "heads with the gun." The gun was being pointed at everybody. M.W. tried to put a blanket over M.C.H.'s head when the defendant almost shot himself. The defendant counted their heads, saying he was going to kill them all. The defendant aimed the gun at M.C.H.'s sister, telling her to put her phone down. He yelled at C.M.F., saying no one else ever loved C.M.F. He slammed the gun onto the table, then heard knocking and hid the gun behind a pillow.

¶ 35 On cross-examination, M.C.H. stated he heard a sound like the gun was cocked back as soon as the defendant came downstairs, before the defendant went into the living room. He could tell from the sound that the gun was being loaded. He also described the sound as what was transcribed as "shtz shtz." The sound was "like the gun was like cocked back." He had been around guns when he was with his biological father, and he heard gun sounds on video games and TV. He heard the gun sound before the gun was pointed at anybody.

¶ 36 M.C.H. stated the defendant choked H.G.W. right after choking Stephanie. The defendant choked Stephanie while she was looking for the ashes. There were a few red marks on H.G.W.'s and Stephanie's throats. The defendant had his shirt on the entire time. M.C.H. had not talked about the events with his mom or sisters.

¶ 37 The defendant's son, C.M.F., was called as a witness by the defense. He testified that he lived with his grandmother. On June 29, 2019, C.M.F. was 12 years old. C.M.F. was at his father's

12

house. He saw the defendant and Stephanie fight over a spoon. Stephanie was cutting pork chops when she turned around so the knife was in the defendant's face. The defendant "disarmed her" by taking the knife away from her, and she fell. She got up and rushed everyone to the bedroom. She said the defendant was chasing them with the knife, but the defendant was not chasing them. C.M.F. never saw the defendant choke or put an arm around the neck of Stephanie or H.G.W. Neither one had any marks on their neck. There was verbal arguing, then the defendant went outside for a while. When he came back in, he went upstairs. C.M.F. heard a thump coming from upstairs.

¶ 38    The defendant came back downstairs with a gun. He pointed it at himself right after loading it as he put the tip of it into the table. He did not point the gun at anyone other than himself. As the defendant put the gun to his head, the police knocked on the door. The defendant put the gun under a pillow and answered the door. C.M.F. stated the defendant was counting to make sure everyone was there. C.M.F. had not talked about what happened other than with R.H.M. and M.M. heading home after that night.

¶ 39    The defendant's mother, Jana Reese, testified on behalf of the defense. On June 29, 2019, at around 8:04 p.m., Jana got a phone call from the defendant who said he was going to get a divorce. Jana gave the phone to her husband, Terry, who died before the trial. Terry and the defendant stayed on the phone for about an hour. After giving the phone to Terry, Jana called Stephanie to let her know she was on the way to pick up R.H.M. and M.M. She was going to get them because their mother would not want them there. Jana talked to Stephanie five more times on the way there, and she arrived at the residence around 10:30 p.m. The defendant was arrested around 9:30 p.m. All six children, Stephanie, and a police officer were there when Jana arrived. The officer was listening to Stephanie, who was gesturing and "acting strange." Stephanie had no injuries to her throat or neck area.

¶ 40    The defendant testified on his own behalf. The defendant was a retired Army military police officer. He had PTSD from being in combat in Iraq, and he was discharged from the military following the diagnosis. On June 29, 2019, he was living with his son C.M.F., Stephanie, and Stephanie's son M.C.H. Stephanie's daughters, H.G.W. and M.W., were there for summer break. The defendant's sons, R.H.M. and M.M., were also there for summer break.

¶ 41    The defendant and Stephanie had been taking Wellbutrin to quit smoking, but they quit taking it the day before. Starting at 5 p.m., they each had four glasses of wine, and the defendant testified he was feeling "buzzed." Stephanie accused the defendant of misplacing a spoon, and he told her "look, dumb ass, there's a spoon here and there's a spoon there; now leave me alone." Stephanie grabbed his collar and slammed him into the fridge. He pushed her off, and she turned towards him with a knife a foot from his face. He took two steps back, hit the fridge, and felt he had nowhere to go. He put her in an "arm bar," causing her to kind of spin and fall. He got "positive control" over the knife. She started stomping with her arms out and screaming "Run for your lives" and "he's chasing us with a knife." The defendant stood there confused, and Stephanie took the kids into the bedroom.

¶ 42    Stephanie and the defendant had been trained in military police tactics, including hand-to-hand combat. The defendant did not think Stephanie intended to stab him because he would have been stabbed before he could have reacted, so he went into the bedroom and told everyone to calm down, but Stephanie kept screaming. Everyone was fixated on the knife, and he poked it into the desk and snapped it in half "rendering it unusable." Stephanie continued screaming, so the defendant told her to get away from the kids if she could not calm down. She began comparing him to her ex-husband, David, who she had accused of strangling her and her oldest daughter in the past. The defendant told Stephanie, "if I'm so bad, leave," but she wanted him to leave. When he told her it was his house and she was going to have to start preparing to leave, she tried to kick

14

him in the groin. He fell backwards into H.G.W., and he pulled Stephanie off the bed as he fell. Stephanie accused him of shoving H.G.W. into the dresser, H.G.W. said her head hit the dresser, and the defendant said he was sorry. He left and went into the kitchen. The defendant testified that after he left the bedroom, he heard Stephanie saying, "He used to choke me all the time." The prosecutor objected to hearsay, and the trial court sustained the objection.

¶ 43    The defendant testified that he went back into the bedroom, and Stephanie started to attack him, so he restrained her in a bear hug. She screamed and made choking noises. M.W. and H.G.W. ran in and started hitting him, so he put one hand on H.G.W.'s sternum and one on her back and held her so she could not punch him. He never had his arm around Stephanie's neck or H.G.W.'s neck, and he never applied pressure to their necks with his arm or impeded their air flow or circulation. The defendant left, went outside, and called his parents.

¶ 44    The defendant was outside talking on the phone with his parents for about 80 minutes, discussing getting a divorce. Stephanie came outside a few times to provoke him. The defendant came back inside and went upstairs to go to bed, feeling depressed and suicidal. He explained he had experienced these feelings in the past with PTSD. Stephanie came upstairs to antagonize him, at which point he became very upset. Thinking about killing himself, he grabbed his unloaded .45-caliber pistol and placed the magazine with five live rounds in it in his back pocket. He racked the slide to clear it and went downstairs. He never threw or broke things upstairs.

¶ 45    Once downstairs, he followed Stephanie into the living room where the children were, wanting to show her he was serious about feeling suicidal and to plead with her to stop egging him on. He and Stephanie began to argue, and at that point he determined he was going to kill himself. As the defendant was talking, she rolled her eyes at him. He got upset and slammed the barrel of the gun into the table and slapped the magazine into it. He brought the gun to his head. As he was

15

squeezing the trigger, the officer knocked on the door. The defendant got startled, threw the gun under the pillow, and answered the door.

¶ 46 The defendant explained that the gun had a flashlight on it that engaged when the middle finger hit a button under the trigger well. He testified that he did not intentionally engage the light that night. He was holding the gun loose enough that the light was not illuminated "a majority of the time." The defendant stated he did not point the gun at anyone other than himself. He was trained in firearm safety and in modes of restraining and detaining people.

¶ 47 At the close of evidence in the bench trial, the trial court discussed the credibility of the witnesses at length. The trial court did not believe Stephanie's children when they testified they had not discussed the events of June 29, 2019, with anyone. Although the trial court stated it did not believe the children were lying, it believed they had been overprepared. The trial court specifically noted the demeanor of the defendant's son, C.M.F., and expressed concerns with his ability to testify. After weighing the evidence, the trial court found the defendant guilty on all counts, stating:

> "THE COURT: But I do believe, and I'm going to be clear to say this on the record, that I believe that the Defendant's testimony, to me, which will read, as I said, like a textbook in a transcript, seemed all but too good to be true. I do believe that he placed Stephanie and [H.G.W.] into some sort of choke holds and that it impeded their air flow. And, therefore, I am finding him guilty of Aggravated Domestic Battery in Count I and Count II.
>
> And I do believe that he lined the whole family up on the couch, counted them off, pointed a loaded gun at them, and then pointed it at his head and endangered the lives of all of these children."

¶ 48    The defendant filed a posttrial motion, arguing that the evidence was insufficient to prove him guilty beyond a reasonable doubt. Alternatively, he argued that he was entitled to a new trial because the trial judge had denied an adjournment at the close of the State's case without calling his sons, C.M.F., M.M., and R.H.M. as witnesses since they were alleged victims in the child endangerment counts. The defendant was able to secure the attendance of his son C.M.F. but was unable to secure the attendance of M.M. or R.H.M. because they lived in Missouri. The trial court denied the defendant's motion, finding that based on the evidence, the trial court's own observations of the evidence, and inferences drawn from the evidence, the State had met its burden to prove the defendant guilty beyond a reasonable doubt as to all charges. The trial court also found that the defendant was not entitled to a new trial because the State was not required to call every potential witness on its list and the defendant had been free to call the same witnesses.

¶ 49    The defendant was ultimately sentenced to 48 months of probation on the aggravated domestic battery convictions and 12 months of probation on each of the child endangerment convictions, to be served concurrently. The defendant filed a timely appeal.

¶ 50                                II. ANALYSIS

¶ 51                        A. Sufficiency of the Evidence

¶ 52    The defendant argues that the State failed to meet its burden of proving the elements of each offense beyond a reasonable doubt. He maintains that no rational trier of fact could have found the State proved him guilty beyond a reasonable doubt because the witness's testimony was so improbable or unsatisfactory that it created a reasonable doubt of the defendant's guilt. The State counters that there was sufficient evidence, especially when viewed in the light most favorable to the State, to establish the defendant's guilt.

¶ 53    Due process protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. U.S. Const., amend.

17

XIV; Ill. Const. 1970, art. I, § 2. In determining whether there is sufficient evidence to convict, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *People v. Cunningham*, 212 Ill. 2d 274, 278-79 (2004). A defendant's conviction will be overturned where the evidence is so "unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). However, it is not the function of a reviewing court to retry the defendant or substitute its judgment for that of the finder of fact. *People v. Teague*, 2013 IL App (1st) 110349, ¶ 26. A reviewing court gives the State the benefit of all reasonable inferences. *People v. Wheeler*, 226 Ill. 2d 92, 116 (2007).

¶ 54    It is the duty of the trier of fact to assess the credibility of the witnesses, assign the appropriate weight to testimony, and resolve discrepancies in the evidence. *People v. Evans*, 209 Ill. 2d 194, 211 (2004). While the trial court's credibility determinations are entitled to great deference, "this deference does not require a mindless rubber-stamp on every bench trial guilty verdict we address." *People v. Hernandez*, 312 Ill. App. 3d 1032, 1037 (2000). However, "a criminal conviction will not be overturned unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Kirkpatrick*, 365 Ill. App. 3d 927, 930 (2006). "This same standard of review applies regardless of whether the defendant received a bench or jury trial." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009).

¶ 55    Here, the defendant was charged with two counts of aggravated domestic battery which required proof that the defendant, while committing domestic battery, strangled Stephanie and H.G.W. 720 ILCS 5/12-3.3(a-5) (West 2018). "Strangle" is defined as "intentionally impeding the normal breathing or circulation of the blood of an individual by applying pressure on the throat or neck of that individual or by blocking the nose or mouth of that individual." *Id.* The defendant

maintains the evidence that Stephanie and H.G.W. were strangled was inconsistent. In support of his argument, he points to inconsistencies among Stephanie and her children's testimony regarding the order of the evening's events, who was strangled first, whether Stephanie or H.G.W.'s ability to breathe was restricted, and whether there were marks on their necks following the choking incidents. He also points out that their testimony differed from his and his son's testimony. The defendant maintains that the only facts agreed upon by all of the witnesses were that after the alleged choking incidents occurred, the defendant simply left the room and then the house, and that no one called the police.

¶ 56    Even contradictory testimony will not necessarily destroy the credibility of a witness as it is the task of the trier of fact to determine when, if at all, a witness testified truthfully. *People v. Gray*, 2017 IL 120958, ¶ 47. The fact finder must decide "how flaws in part of the testimony affect the credibility of the whole." (Internal quotation marks omitted.) *Id.* "Minor discrepancies in testimony affect only its weight and will not render it unworthy of belief." *Id.* In the instant matter, the trial court recognized there were inconsistences among the children's testimony. Even so, the trial court identified a common theme in the witness testimony—the children were present when an argument broke out between the defendant and Stephanie, and the argument became physical.

¶ 57    The defendant contends that he did not choke H.G.W. but merely defended himself as she continued to hit him. He denied putting his arm around her neck, applying pressure to her neck or throat, or impeding her air flow or circulation of blood. The defendant also contends that there were no marks on H.G.W.'s neck and that there was no testimony that she saw a doctor after the incident although she claimed to have hit her head on the dresser, causing her to have ringing in her ears and headaches for some time. Additionally, the defendant points out inconsistencies between his testimony and Stephanie's testimony. The defendant denied placing his arm around Stephanie's throat, or in any way impeding her air flow or circulation of blood by squeezing her

around the neck with his arm. The defendant also attacks Stephanie's credibility by pointing out that she did not call the police nor did she take the family to the hospital to be treated. While the defendant concedes that section 12-3.3(a-5) of the Code does not require proof of visible injury as an element of this offense, he posits that the absence of any visible, physical mark on a victim is important to an evaluation of the sufficiency of the evidence, particularly when the entire case turns on the credibility of witnesses. See 720 ILCS 5/12-3.3(a-5) (West 2018).

¶ 58    Here, we cannot say that the evidence was so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt of aggravated domestic battery. H.G.W. testified that when the defendant was attempting to pull her mother off the bed, H.G.W. started hitting him, telling him to stop. She stated the defendant picked her up with her feet off the ground and choked her. While he was choking her, she was unable to talk. Although she did not lose consciousness, her breathing was affected, and she felt pressure on her neck. Stephanie testified that she felt the defendant's arm come around her neck, and he began choking her to the point she could not breathe. She testified that while her ability to breathe was compromised, she did not pass out and did not have injuries on her neck.

¶ 59    "When evidence is merely conflicting, a reviewing court will not substitute its judgment for the judgment of the trier of fact." *People v. Downin*, 357 Ill. App. 3d 193, 202 (2005). A reviewing court will not substitute its judgment for that of the trial court, particularly on issues of witness credibility, the weight their testimony deserves, or the reasonable inferences that may be drawn from their testimony or from other evidence presented as the trial court had the opportunity to observe and hear the witnesses. *In re Gabriel W.*, 2017 IL App (1st) 172120, ¶ 29. Accordingly, after viewing all of the evidence in the light most favorable to the State, as we must, we conclude that a rational trier of fact could have found beyond a reasonable doubt that the defendant was guilty of both counts of aggravated domestic battery.

¶ 60    The defendant next argues that the State failed to meet its burden of proving the defendant guilty beyond a reasonable doubt of all five counts of endangering the life and health of a child. The defendant was charged under subsection (a)(1) of the Code, which provides that a person endangers the life or health of a child when he "causes or permits the life or health of a child under the age of 18 to be endangered." 720 ILCS 5/12C-5(a)(1) (West 2018). The defendant claims the State failed to prove when the gun was loaded and whether he pointed the gun at the children's heads. He contends that the State failed to prove that the gun was loaded until just before he put it to his own head.

¶ 61    When Officer Tripp located the gun under a couch pillow, it was loaded with four rounds in the magazine and one in the chamber, and it was operable. There is no question that the trial judge heard conflicting witness testimony as to whether the gun was loaded when the defendant came back downstairs. Stephanie, a former air force security officer, testified she heard the defendant "rack a round into the chamber" of the gun as she was walking into the living room. Her children described the sounds they heard as the gun was being loaded before the defendant forced them to sit on the couch. However, the defendant and his son, C.M.F., testified that the gun was unloaded until right before the defendant pointed the gun at himself. The trial court did not believe the defendant's explanation that the sound that everyone heard was the defendant racking the slide to make sure there was no bullet in the chamber. Ultimately, the trial court rejected the defendant's and C.M.F.'s testimony.

¶ 62    The defendant also maintains that the State failed to prove that he pointed the loaded gun at the children's heads despite the testimony of Stephanie and her children that he did so. As previously noted, it is the fact finder's duty to resolve discrepancies in the evidence. *Evans*, 209 Ill. 2d at 211. Here, the trial court resolved the discrepancy in the evidence in favor of the State.

21

¶ 63    In essence, the defendant is asking this court to reweigh the credibility of the witnesses, which we cannot do. Even where the testimony of a single witness is contradicted by the defendant, it is sufficient to convict if the testimony is positive and credible. *Gray*, 2017 IL 120958, ¶ 36. "Where the finding of the defendant's guilt depends on eyewitness testimony, a reviewing court must decide whether a fact-finder could reasonably accept the testimony as true beyond a reasonable doubt." *Id.* "Under this standard, the eyewitness testimony may be found insufficient 'only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt.' " *Id.* (quoting *Cunningham*, 212 Ill. 2d at 279). "A conviction will not be reversed simply because the evidence is contradictory or because the defendant claims that a witness was not credible." *Id.* Under the facts presented, we cannot find that the evidence compels an opposite conclusion. In viewing the evidence in the light most favorable to the State, we conclude a rational trier of fact could have found the essential elements of child endangerment beyond a reasonable doubt. *Cunningham*, 212 Ill. 2d at 278-79.

¶ 64                                B. Other-Crimes Evidence

¶ 65    The defendant argues that the State improperly presented evidence of other crimes without having filed a motion pursuant to section 115-7.4 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.4 (West 2022)), and without the court weighing the prejudicial effect versus the probative value of that evidence. The State counters that the defendant's argument is without merit where the State did not intend to, nor did it, offer evidence of other crimes.

¶ 66    "The term 'other-crimes evidence' encompasses misconduct or criminal acts that occurred either before or after the allegedly criminal conduct for which the defendant is standing trial." *People v. Spyres*, 359 Ill. App. 3d 1108, 1112 (2005). The general rule is that proof of other crimes committed by the defendant not related to those alleged in the charging instrument cannot be introduced to show the defendant's propensity to commit crime. *People v. Hale*, 326 Ill. App. 3d

22

455, 462 (2001). However, the rule has been abrogated in part by section 115-7.4 of the Code of Criminal Procedure, which provides that "evidence of a defendant's commission of other acts of domestic violence may be admitted in a prosecution for one of the offenses enumerated in the statute, so long as the evidence is relevant and its probative value is not substantially outweighed by the risk of undue prejudice." *People v. Dabbs*, 239 Ill. 2d 277, 291 (2010). Section 115-7.4(c) provides that where the State intends to offer other-crimes evidence under this section, the State "must disclose the evidence, including statements of witnesses or a summary of the substance of any testimony, at a reasonable time in advance of trial, or during trial if the court excuses pretrial notice on good cause shown." 725 ILCS 5/115-7.4(c) (West 2022).

¶ 67    The defendant insists he was deprived of a fair trial where the State presented Stephanie's testimony that the defendant had strangled her two years prior, leaving bruises on her neck, without the State having filed the appropriate motion. The State responds that it did not present such evidence; rather, the defendant did. On cross-examination, Stephanie testified that the defendant had his arm around her neck long enough to cause panic but not long enough to leave a mark, which she stated she knew from having "been choked by him before where I had bruising all over my neck." Instead of objecting to that response, defense counsel asked additional questions about the alleged prior incident. The State never elicited testimony about the defendant strangling Stephanie at a time other than on June 29, 2019. When Stephanie testified about the defendant strangling her in 2017, she did so on cross-examination while being questioned by defense counsel. The record contains no indication that the State even knew about the 2017 incident, as Stephanie testified that she never reported it.

¶ 68    The defendant acknowledges that no objection was made to the testimony at trial, and the issue was not included in his posttrial motion. Recognizing his forfeiture of the issue, the defendant claims that his defense counsel was ineffective for not preserving the issue. See *People v.*

23

*McDonald*, 2016 IL 118882, ¶ 45 ("Generally, to preserve a claimed error, a defendant must both object at trial and include the issue in his posttrial motion."). The State argues that the claim is without merit as defense counsel was not ineffective for failing to argue that the State improperly presented other-crimes evidence in violation of section 115-7.4 because the State did not present such evidence and did not argue the defendant had a propensity to commit crimes. Furthermore, the State correctly notes that while other-crimes evidence is inadmissible to show the defendant's propensity to commit a crime, such evidence is admissible where it is relevant for any other purpose. *People v. Thompson*, 359 Ill. App. 3d 947, 951 (2005).

¶ 69    A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29. To prevail on a claim of ineffective assistance of counsel, "a defendant must show that counsel's performance was (1) deficient and (2) prejudicial." *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 61. "Failure to satisfy either prong negates a claim of ineffective assistance of counsel." *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88. Whether counsel was ineffective is a mixed question of fact and law. *People v. Peterson*, 2015 IL App (3d) 130157, ¶ 222. "[T]he ultimate question of whether counsel's actions support a claim of ineffective assistance is a question of law that is subject to *de novo* review on appeal." *Id.*

¶ 70    "To establish deficient performance, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy." *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007). "This means the defendant must show that counsel's errors were so serious, and his performance so deficient, that he basically did not function as the 'counsel' guaranteed by the sixth amendment." *Id.* at 342. The general rule is that defense counsel is presumed to pursue sound trial strategies. *People v. McMillin*, 352 Ill. App. 3d 336, 344 (2004). This presumption of soundness of defense counsel's performance gives way to a finding of deficiency only where no

24

reasonably effective criminal defense attorney, confronting the trial's circumstances, would engage in similar conduct. *Id.*

¶ 71     The State submits that where Stephanie admitted to having marks on her neck following the 2017 strangling incident, but did not have marks in the 2019 incident, it was a matter of trial strategy for defense counsel to highlight that fact through further questions instead of objecting to it. Thus, not objecting to the testimony of strangulation leaving marks was consistent with defense counsel's argument that the defendant's charged actions would have left marks on Stephanie and H.G.W. We agree and find that defense counsel's performance was not deficient. Accordingly, the defendant's failure to establish that defense counsel's performance was deficient negates his claim of ineffective assistance of counsel.

¶ 72                                    III. CONCLUSION

¶ 73     For the foregoing reasons, we affirm the defendant's convictions.


¶ 74     Affirmed.