THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NORMAN RAY McMILLIN, Defendant-Appellant.

Fifth District   No. 5—02—0794

Opinion filed September 1, 2004.

Daniel M. Kirwan and Larry R. Wells, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Steve Friedel, State's Attorney, of Vandalia (Norbert J. Goetten, Stephen E. Norris, and Rebecca E. McCormick, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KUEHN delivered the opinion of the court:

This case was prosecuted by a seasoned attorney who knew full well what the law permits a prosecutor to do and what the law prohibits a prosecutor from doing. It was defended by a lawyer who apparently lacked that knowledge. In the face of an opponent unable to hold him in check, the prosecutor seemingly took advantage, unwilling to voluntarily adhere to the rules of evidence or the limitations upon his own conduct. As a result, we are presented a case where the State exploited trial counsel's weaknesses in a way that vanquished the promise of a fair trial designed to produce a just result.

Norman Ray McMillin (the defendant) stood trial on charges of driving under the influence of alcohol and driving on a revoked license. A Fayette County jury found him guilty as charged. He currently serves two 30-month prison terms.

The failure to file a posttrial motion is among the numerous mistakes made in the defense of this case. A number of legitimate issues lay forfeit because of it. However, only one issue is important to the result that we must reach. Because a review of these proceedings demonstrates professional errors that likely affected the trial's outcome, we reverse and remand for a new trial.

Here are the salient facts necessary to an understanding of our decision.

On March 2, 2002, the defendant and his partner, Tim Wehrle (Tim Wehrle or Wehrle), operated a logging business. A mutual friend, Allan Dothager, worked for them. March arrived like a lion that year.

On the evening of March 2, 2002, the temperature dropped, the wind blustered, and Fayette County, Illinois, experienced the worst winter storm of the year.

A Fayette County sheriff's deputy found the defendant standing in the snowstorm that night. The deputy had tracked footprints in the snow from Tim Wehrle's disabled truck to where the defendant stood. The defendant was having a cell phone conversation when the deputy approached him. Wehrle's truck had been driven off the road, down an embankment, and onto a snowy plowed field. The truck was stuck in the mud and the snow.

The defendant spent the rest of that evening in jail, charged with driving under the influence of alcohol (DUI) and driving on a revoked license.

The defendant testified at his trial and gave his version of the evening's events. His testimony included the following claims.

When he, Tim Wehrle, and Allan Dothager finished work on the afternoon of March 2, 2002, Wehrle drove the threesome to the local Veterans of Foreign Wars (VFW) hall. They entered the hall, bellied up to the bar, and began drinking alcoholic beverages. The defendant laid claim to having consumed "three or four" beers and "a couple of mixed drinks." After a couple of hours of drinking, the defendant departed the hall and returned to Wehrle's truck. He climbed in and passed out on the front seat.

When the defendant awoke, he found himself in a snow-covered, plowed field. He was totally befuddled about how he had gotten there. The truck had been driven off the road and was stuck. The defendant exited the truck and walked up the hill as he reached for his cell phone to summon help. In the middle of a conversation with his brother, a Fayette County sheriff's deputy walked up to him. Deputy Larry Halleman wanted to discuss the disabled truck.

The defendant acknowledged that he first claimed that his brother had been the driver of the truck. He had meant to say that he assumed that the truck's owner, his business partner Tim Wehrle, had driven the truck to where it rested. He corrected his misstatement at the scene of Deputy Halleman's initial interrogation.

The defendant claimed that when Deputy Halleman pointed out that the defendant's footprints were the only prints leaving the truck, he started to doubt himself. He wondered whether he may have driven the truck and lost his memory of that fact due to an alcohol-induced blackout. According to the defendant, that is why he conceded to Deputy Halleman that it was possible that he had been the one who had driven the truck off the road.

The defendant further testified that, upon reflection, he realized that his footprints did not prove that he, rather than Tim Wehrle, had driven Wehrle's truck from the VFW to its snowy resting place. Tim Wehrle could have driven the truck into the field and walked away from it at a time when a lot less snow had fallen. The snow could easily have covered his tracks by the time Deputy Halleman arrived at the scene. Moreover, the defendant was certain that he never had Tim Wehrle's truck keys.

Thus, the defense was simple. The defendant denied being the driver of the truck. The vehicle's owner (Tim Wehrle) or Allan Dothager must have driven the truck into the field and left the scene while the defendant remained passed out and unaware of the circumstances. The defendant did not drive on a revoked license, and he did not drive while being alcohol-impaired, because he did not drive any vehicle that night.

Several events transpired during the trial that are pertinent to our decision.

Tim Wehrle and Allan Dothager did not testify at the trial. Neither the State nor the defendant produced either one of them. However, the prosecutor decided to introduce a hearsay version of what Tim Wehrle would have said, had he been called to testify about driving the truck. Thus, Wehrle's refutation of the defendant's testimony, and the core defense, was established without confrontation or cross-examination. Defense counsel did not object.

The following is the factual foundation for the hearsay.

Tim Wehrle arrived at the arrest scene before his truck was extricated from the field. (We are not told how Wehrle knew where to find his truck.) He asked Deputy Halleman whether he could have the truck. Deputy Halleman, in an accusatory tone, asked Wehrle whether he had knowingly allowed the defendant to drive the truck without a license and in an inebriated condition.

After laying this foundation, the prosecutor asked Deputy Halleman to relate to the defendant's jury what Wehrle had told him in response to the question. Deputy Halleman *described to the jury what Tim Wehrle had told him*: " '[The defendant] took the truck without permission. He's not supposed to be driving it.' "

Thus, the jury learned not only that Wehrle denied being the driver of the truck but also that Wehrle accused the defendant of having stolen the truck.

It was an excellent way for the State to have Wehrle counter the defendant's testimony. The State did not have to worry about a cross-examination that might have pointed out that it was Wehrle's truck, that Wehrle had been drinking heavily too, and that Wehrle would

have been a DUI offender had he, in fact, driven the truck that night. Had Wehrle been the one to drive his truck into the muddy field, he would have wanted to exit the scene as soon as possible. Wehrle did not have to manage an explanation about how he had gotten home from the VFW that night, how he knew where to find his truck, or how the defendant could have obtained his truck keys without his permission.

Tim Wehrle's hearsay evidence proved particularly powerful in light of the following improper closing argument tendered by the prosecutor:

> "No other person—no evidence was presented from anybody else's mouth saying, ['][H]ey, I drove the truck and I left and went to get help['] or something. *You didn't hear that evidence from anybody. There's his boss and his other buddy who he works with[;] they're around[;] they didn't come in here and verify his story because they can't; they're not going to lie under oath."* (Emphasis added.)

Deputy Halleman testified that he did not have a specific recollection of seeing the keys in the truck that evening. However, he concluded that the keys must have been in the truck because the tow operator was able to pull the truck out. The truck had to be turned on in order to disengage its gears for towing. Deputy Halleman's conclusion did not take Tim Wehrle's presence at the scene into account. Wehrle arrived before the truck was towed and could have given the tow operator the keys. This circumstance gives context to another improper closing argument. The prosecutor told the jury:

> "Halleman also testified that Wehrle showed up and Wehrle didn't bring the keys with him[;] the keys were there, just like Halleman testified to."

There was nothing offered about Wehrle and the truck keys, not even hearsay. The State concedes as much on appeal. This concocted, and damaging, extension of Deputy Halleman's testimony was not challenged by defense counsel.

Deputy Halleman's police report of the incident was not in evidence. Its contents were never discussed during the trial. Yet defense counsel allowed the prosecutor to argue that it contained prior consistent statements that credited Deputy Halleman's testimony. There was no objection when the prosecutor argued:

> "Larry Halleman's testimony is consistent today with what he put in his report back on March 2nd when this happened ***."

There was a stipulation entered into between the State and the defendant. It was agreed to in the stipulation that the State could prove that the defendant's driver's license had been revoked prior to March 2, 2002. The stipulation avoided any mention of why the license

had been revoked. The stipulation would not convey the message that the defendant was a repeat offender with a penchant for driving drunk.

There was no indication that any of the defendant's considerable criminal history would be interjected into the trial. That is, not until the defendant's lawyer rose during opening statements and announced to the jurors:

> "We believe[,] when you get to the end of this case and after you reflect on the evidence[,] the evidence will show starting about 1990 Mr. McMillan [*sic*] did some stupid things. *He got a DUI or two* when he was a younger man. He never got out of the hole. Mr. Matoush, in a different county as prosecutor, handled his previous encounters with DUIs *and failing to abide by orders of the court relating to those, and there's a history of that* and it goes on up. *He's had a prior felony for driving on a revoked license.* We're not going to hide that from you. *It's important you know that.* \*\*\*
>
> \* \* \*
>
> \*\*\* December '97, *Mr. McMillan [sic] was sentenced to two years [D]epartment of [C]orrections for driving revoked.* It's not something he's proud of but it's something he can't run from, and *I think it's relevant to this case* as you hear the evidence." (Emphasis added.)

Thus, defense counsel told the defendant's jury that two prior drunk-driving convictions, disobeying court orders that arose from those convictions, and a felony conviction for driving after his license had been revoked, based upon his persistent drunk driving, were not only relevant to his guilt or innocence here but also important for the jurors to know about.

True to this declaration, defense counsel placed significant emphasis on eliciting the defendant's prior criminal history. Counsel considered it relevant and important for the jury to also know about a 1994 aggravated battery conviction, as well as the two prior DUI convictions and the felony driving-on-a-revoked-license conviction. Defense counsel also wanted the jury to know about the punishments meted out for the defendant's sundry crimes. Here is an excerpt of defense counsel's somewhat remarkable questioning of his client.

> "Q. [DANIEL GOGGIN (defense counsel):] Prior to the charges you're facing today you've had two prior DUIs; is that correct?
>
> A. [THE DEFENDANT:] Yes, sir.
>
> Q. The first one was when?
>
> A. December '90.
>
> Q. And your second one was?
>
> A. In '91, I think.
>
> \* \* \*
>
> Q. Then sometime later you ended up pleading guilty to an aggravated battery charge?
>
> A. Yes, sir.
>
> \* \* \*

Q. What year was that, do you recall?

A. It was around '94, I believe.

\* \* \*

Q. As a part of your sentence on that you were to do so many weekends in the county jail?

A. Yeah, I had—if I recall, I think it was like 20 weekends, or something like that.

\* \* \*

Q. Then you had occasion in '96 to be charged[—]felony charge [—]driving on revoked?

A. In '96? Yeah.

\* \* \*

Q. What was your sentence on that '96 charge?

A. Three years [D]epartment of [C]orrections."

Thus, the jury learned about the defendant's life of crime, a past that defense counsel declared relevant to the jury's decisionmaking and important to reaching a proper outcome on the case. The defendant's jury was assisted in deciding whether the defendant drove drunk, and drove on a revoked license, by knowing that the defendant had been caught and convicted of driving drunk on two separate prior occasions. The jury was also helped in its decisionmaking by knowing that the defendant had no qualms about driving after his license had been revoked. It learned through defense counsel's questioning that the defendant had done it before and had been sent to prison for it. Clearly, counsel aptly established the relevant, albeit highly prejudicial fact that this defendant had an absolute penchant for committing the crimes with which he was charged. Beyond that, jurors learned that they were dealing with an individual who had been in and out of prisons and jails throughout the preceding decade, due to a decade's disdain for the law.

This rather convincing proof of the defendant's propensity for committing the crimes with which he was charged, in addition to a violent felony offense, was not good enough for the prosecutor. Since defense counsel had opened the door to the defendant's criminal history, the prosecutor felt at liberty to explore the topic during cross-examination. The following is an excerpt of that examination. Defense counsel was silent throughout the questioning.

"Q. [ROBERT MATOUSH (State's Attorney):] You told us about your aggravated battery conviction. You didn't tell us about an escape conviction, did you?

A. [THE DEFENDANT:] I wasn't asked.

Q. Well, did you—after you pled guilty to aggravated battery[,] were you supposed to show up at the jail?

A. I had a bum lawyer named Huey Craig that said I was done with my weekends and I only had like a couple—about three weekends left and he said I was done, because they changed it from every weekend to every other weekend, and then about six months later down the road I get arrested for escape charge [*sic*] from Clinton County.

Q. And then you pled guilty to that charge, didn't you?

A. I didn't have much to stand on. They done had me guilty right that day in the courtroom. Right there in Clinton County.

Q. So you got two DUIs and you've got an aggravated battery that [*sic*] you've been convicted of an escape, and what else, felony driving while license revoked?

A. From the DUIs.

Q. When did you get the felony driving while license revoked?

A. It was in '96.

Q. You went to prison, right?

A. Yes, sir.

Q. How much prison did you do? You told us you did three years.

A. I did two years out of a three[-]year sentence.

Q. So you did two years, not three.

A. I got a three[-]year sentence and I ended up doing like ten months out of a three[-]year sentence, if I recall it right.

Q. Are you sure you got a three[-]year sentence?

A. I'm pretty sure, yeah.

* * *

Q. *** If your court papers say you only got two years, do you dispute that?

A. It's been a long time since I seen them court papers from back in '96.

Q. So it might have been two years instead of three years?

A. It might have been. I done ten months on a two-year sentence. I know it was at least two to three years and I did ten months."

To the extent the amount of prison confinement that the defendant actually endured because of committing a crime, identical to the crime charged, on an earlier occasion had any bearing on this case, the presentence report shows that the defendant had been sentenced to a 2½-year term of imprisonment for aggravated battery, which had been served, in part, at the same time as a two-year sentence for driving on a revoked license.

The defendant was never charged with, or convicted of, the offense of escape. The actual charge and conviction was less aggravated. The defendant pled guilty to, and was sentenced for, the failure to appear.

We are asked to overturn the defendant's convictions because of trial counsel's incompetence. We reverse, and we remand for a new trial.

■ Generally, defense counsel are presumed to pursue sound trial strategies. *Strickland v. Washington*, 466 U.S. 668, 689, 80 L. Ed. 2d 674, 694-95, 104 S. Ct. 2052, 2065 (1984). The presumptive soundness of their performance gives way to a finding of representation's deficiency only where no reasonably effective criminal defense attorney, confronting trial's circumstances, would engage in similar conduct. *People v. Faulkner*, 292 Ill. App. 3d 391, 394, 686 N.E.2d 379, 382 (1997). The constitution's guarantee of "assistance of counsel" calls for "reasonably effective assistance." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

Criminal defense lawyers must assist defendants in a way that the constitution's guarantee to "assistance of counsel" contemplates. As we pointed out in *People v. Lefler*, 294 Ill. App. 3d 305, 689 N.E.2d 1209 (1998):

> "The constitution contemplates assistance that engages evidentiary rules to shield an accused from a decision based on unreliable evidence. [Citation.] It contemplates assistance that appreciates and understands legal principles applicable to the case. [Citation.] It contemplates assistance ready to provide adversarial check to a prosecutor's excessive endeavors. [Citation.] In short, the constitution contemplates more help from counsel than this defendant received." *Lefler*, 294 Ill. App. 3d at 310, 689 N.E.2d at 1213.

The constitution calls for better assistance than that which was provided here.

■ We cannot discern a strategy for allowing the State to introduce a hearsay statement from Tim Wehrle that refuted the defendant's core defense. Allowing Wehrle's hearsay claim that the defendant stole Wehrle's truck that evening had to stem from an inability to recognize hearsay evidence or from ignorance about the general rule against hearsay's admissibility. Either way, defense counsel allowed damaging hearsay, clearly improper in nature, to be admitted into evidence. The hearsay was testimonial in nature, in violation of the defendant's sixth amendment right to confrontation. See *Crawford v. Washington*, 541 U.S. 344, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004). No reasonably effective defense attorney, confronting a similar improper effort to introduce damaging hearsay evidence, would allow for it.

Nor would reasonably effective criminal defense attorneys allow jurors to hear and consider their failure to call witnesses to verify their client's testimony. Those lawyers would not stand for a prosecutor telling jurors that witnesses would have to commit perjury to corroborate their client's testimony.

Reasonably effective criminal defense attorneys would halt prosecutorial efforts to make up evidence and to corroborate their key witnesses with prior consistent statements contained in police reports.

They would object to cross-examination about their client's criminal past and would further object to the introduction of a criminal conviction that does not exist.

Which brings us to the strategic decision to elicit all the defendant's prior criminality with defense counsel's advance admonition to jurors that the defendant's prior crimes were "relevant" and "important" to the jury's decisionmaking.

The State argues:

> "Defense counsel's case rested on the credibility of the defendant. In order to lend some credibility to the defendant's otherwise incredible defense and testimony, counsel chose to present evidence that whenever the defendant had been convicted before, he had always pled guilty. Defense counsel chose to bring out the peculiarities of the defendant's prior criminal history in order to bolster the defendant's credibility[ ] and to arouse the passions of the jury against the prosecutor, hoping for jury nullification."

The State correctly deciphers defense counsel's strategy. Defense counsel argued to the jury:

> "He [(the prosecutor)] can make whoop-dee-doo about his past convictions, but look what Mr. McMillan [*sic*] has had to display to all of you[—]that he's got a decade of criminal activity being a DUI [*sic*]. He's very straight[ ]forward, put that out on the record, told you about a sentence of imprisonment for driving revoked that he had and they sought up to three years, if that meant anything. What's that history of Mr. McMillan's [*sic*] criminal past tell us? He's got a felony, that's fine. It also tells us up until these charges he has always pled guilty. He has always come before the bar and taken responsibility for what he's done. *** He's always not gone through the expense of a jury trial and pled guilty to the charges that he faced. But this time is different. He wasn't driving a vehicle."

The State also recognizes an additional component of this strategy. Defense counsel emphasized that the same prosecutor, the one trying the charges leveled here, successfully prosecuted all the defendant's other crimes. As the State correctly points out, defense counsel implied that this prosecution was a part of a decade-long vendetta that the prosecutor had waged against the defendant. However, this component of the strategy fell apart because the public record simply does not support it. Defense counsel apparently did not check public records to learn that this prosecutor was not the same prosecutor who had successfully prosecuted the defendant during his "decade of criminality." Had it been accurate that one man had prosecuted the defendant throughout the decade, it could hardly be said to have constituted a vendetta when the defendant admitted that he had committed all the crimes for which he had been prosecuted and had willingly pled guilty and accepted his punishment.

It is important to note that this is not a case where defense counsel's pretrial efforts to prevent prior convictions from being used for impeachment failed. Nor is it a case where the State was going to be permitted to prove other prior criminality for some purpose other than the accused's propensity for criminal behavior. In those instances, reasonably effective criminal defense lawyers might try to soften such evidence's impact by eliciting it themselves with the "owning up" spin that a guilty plea would allow.

Here, in the absence of defense counsel's decision to be "straight-forward" and in the absence of his belief that the defendant's criminal past was "relevant" and "important" for the jurors to know, jurors would never have known that this was not the first time, not the second time, but the third time that the defendant faced drunk-driving charges. Jurors would not have known that the defendant was clearly capable of committing the crimes charged and had admittedly committed drunk driving two times before. In the absence of defense counsel's zeal to show jurors that when this defendant got caught committing a crime in the past, he had always owned up to it, jurors would never have known that the defendant went to prison for admittedly committing the same crime with which he was charged, in addition to battering someone in an aggravated way. Jurors would never have been told that the defendant repeatedly disobeyed court orders imposed for his criminality or that he had been convicted of escape, which was factually untrue.

While we readily agree with the State's assessment of what defense counsel's strategy was, we do not agree with the conclusion that the strategy was sound. "Sound trial strategy is made of sterner stuff." *People v. Moore*, 279 Ill. App. 3d 152, 159, 663 N.E.2d 490, 496 (1996).

We think it decidedly unsound strategy to inform a jury that the accused is a perpetual outlaw who has engaged in a decade of criminal activity. We find it a decidedly defective tactic to disclose repeated and admitted law-breaking behavior identical to the charged conduct, in an effort to heighten the credibility of the current denials. There is nothing reasonable about such a strategy. Reasonably effective criminal defense lawyers would never pursue it.

The reason is simple. Reasonably effective advocates would worry about the downside from such a strategy, based upon the true impact that such evidence would have upon law-abiding people who sit as jurors. This kind of evidence bears a high degree of prejudice. It carries an overwhelming ability to dominate decisionmaking, swaying people to convict, regardless of what the actual evidence to support the charged conduct can establish. This is precisely why the State, despite its strong desire to present the kind of evidence elicited by defense counsel in this case, is generally barred from introducing it.

Here, there is no question that jurors would correctly conclude that the defendant was the kind of human being who possessed little if any respect for the law.

Reasonably effective criminal defense attorneys would fear that jurors would conclude that the defendant harbored a penchant for driving drunk. They would fear that jurors would see how the defendant could not care less about driving without a license after his license had been revoked for drunk driving.

Competent counsel would be concerned that jurors would understand that because the defendant had driven on a revoked license before, he was infinitely more likely to have done it again. Those same jurors might also understand that the defendant faced considerably more punishment than the three years of imprisonment that counsel told them about, if the defendant was found guilty of repeating the same offense shortly after his release from prison. They could easily conclude that the defendant's past interity about admitting his guilt gave way to lying about his conduct in order to avoid the prospect of severe punishment.

In all likelihood, this is how jurors used the information defense counsel decided to give them. It is infinitely more likely that the jury reached these conclusions from evidence of the defendant's criminal past rather than the intended conclusion that the defendant possessed the integrity to plead guilty if he had committed the charges in question.

We find that defense counsel's performance was not objectively reasonable. The defendant did not receive reasonably effective assistance of counsel.

To succeed on a sixth amendment claim of ineffective assistance of counsel, the defendant must show that there is a reasonable probability that, but for counsel's professional shortcomings, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. A reasonable probability means a probability sufficient to undermine confidence in the outcome of the case. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

Under this test for constitutionally ineffective assistance of counsel, we are constrained from providing a defendant relief solely upon the basis of his attorney's level of performance. The test measures the performance against its potential effect on the outcome of the case. Therefore, even where counsel's mistakes are egregious, we are required to examine them in the context of all the evidence in the case. We must determine whether a different outcome was reasonably possible in the absence of counsel's errors.

We believe that there is a reasonable probability that, but for counsel's failings, the trial's outcome may have been different. Counsel's presentation of the defendant's "decade of criminality," the prosecution's cross-examination about that history, the distortion of critical evidence during closing argument, and Tim Wehrle's hearsay accusation are significant errors, the cumulative effect of which undermines confidence in the outcome of the case. We cannot say, given the presence of significant professional errors, that the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

Because the defendant was deprived of his constitutional right to the effective assistance of counsel, we reverse and remand for a new trial.

Reversed; cause remanded.

MAAG and GOLDENHERSH, JJ., concur.