NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250192-U

NO. 4-25-0192

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 7, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| STANLEY EARL SCOTT, | ) | No. 23CF846 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | William A. Yoder, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Justices Grischow and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Trial counsel did not render ineffective assistance of counsel and there was no error in the trial court's *Krankel* inquiry.

¶ 2    Following a jury trial, defendant Stanley Earl Scott was convicted of six felonies. He received an aggregate sentence of 62 years in prison. In this direct appeal, he asserts that his trial counsel was ineffective for failing to seek severance of one of the charges against him and failing to adequately cross-examine the State's key witness. Additionally, defendant argues that the trial court conducted an inadequate preliminary inquiry into his claims of ineffective assistance under *People v. Krankel*, 102 Ill. 2d 181 (1984).

¶ 3    For the reasons that follow, we affirm.

¶ 4                                 I. BACKGROUND

¶ 5    In August 2023, the State charged defendant via information with two counts of armed robbery (720 ILCS 5/18-2(a)(3), (4) (West 2022)), two counts of aggravated battery (*id.*

§§ 12-3.05(e)(1), (f)(1)), unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)), and obstruction of justice (*id.* § 31-4(a)(1)). The information was later supplanted by a superseding indictment for the same offenses. The charges stemmed from the early morning armed robbery of Eldis Martin on August 7, 2023, in Bloomington, Illinois.

¶ 6                                    A. Trial and Verdict

¶ 7            At trial, the evidence established that Nicole Trumbo was a confidential informant for police. She had been informing on various suspects in order to receive a favorable disposition on her pending felony theft charge. The State entered into a use-immunity agreement with Trumbo to overcome any self-incrimination objection she might raise to testifying.

¶ 8                                    1. *Testimony of Nicole Trumbo*

¶ 9            When Trumbo took the stand to testify, the State commented that she was "[o]bviously" in custody, suggesting that she likely appeared in a county jail jumpsuit and/or shackles. Trumbo then informed the jury that she was in custody for armed robbery and was a codefendant in this instant case. She said she was informing on defendant even though she was in a romantic relationship with him, and she acknowledged that such a relationship violated the terms of her confidential informant agreement. She knew defendant by the nickname "Snake" and had him as a contact in her phone under that name. Trumbo regularly had sex with Martin in order to obtain cocaine.

¶ 10          At approximately 1:40 a.m. on August 7, 2023, Trumbo contacted Martin via text message while lying in bed next to defendant with the intention of engaging in a sex-for-drugs exchange with Martin. Defendant asked her who she was texting, and she indicated that Martin wanted to exchange drugs for sexual favors. Defendant asked if Trumbo wanted him to rob Martin. Initially she said "no," but after a "couple more shots of vodka," she said "yes." The two then

- 2 -

conspired to rob Martin of his cocaine but, per Trumbo, these discussions did not involve the use of firearms. Trumbo thought that defendant would physically overwhelm Martin and rob him.

¶ 11 Trumbo arranged a meeting with Martin at an acquaintance's home. When she arrived, she sent Martin a text message. She was also communicating with defendant by text message around the same time. After Martin arrived at the acquaintance's home, Trumbo suggested they walk to the residence of another friend of hers, Jeremy; she thought it would be easier to rob Martin out in the open rather than inside a house. Defendant and Trumbo had planned to rob Martin at Jeremy's house. Trumbo texted defendant when they were leaving the first location and informed him where on his body Martin had concealed the cocaine. When they left the house, Trumbo did not remember Martin having a bicycle with him. Shortly after stepping onto the sidewalk, she noticed a Black male wearing all black and a black facemask following them. At some point, she figured out that this was Robbie Gunn.

¶ 12 Trumbo and Martin arrived at a large, two-story, white house and began to walk up its driveway. Defendant appeared from behind the house next door holding a gun and stopped the pair in the driveway. Defendant pointed the gun at Trumbo and told her to leave. She could not remember previously telling police that defendant had two guns. Defendant told Martin to "up it, to give him whatever he had." Martin began to scream, and defendant then pistol whipped him while Martin was trying to make his way back toward the street. Trumbo began to run and heard two gunshots. She ran to Gunn's house, where defendant was staying, and saw Gunn at the house dressed in the same clothes he was wearing when Trumbo had seen him following her and Martin.

¶ 13 When defendant returned to the house, he was covered in blood. He told Trumbo that he had shot Martin in the shoulder. Trumbo stripped him of his clothes, and defendant took a shower. Defendant told Trumbo to "get rid of" the clothes, so she bleached them and then set them

on fire in the bathtub. She bagged up what was left, and defendant had someone come and pick up the clothes and the gun. She deleted the messages between her and defendant and her and Martin from her cell phone. Defendant had lost his phone at the scene of the altercation with Martin. Trumbo went back to the scene to retrieve it, but police were already there.

¶ 14       On cross-examination, defense counsel established that Trumbo had participated in three interviews with police. Two of the interviews occurred on the same day, in short succession, and she was "drunk" for both. Trumbo clarified that she did not regularly purchase drugs from Martin, as she had "other connections" and Martin was not the only person with whom she would exchange sexual favors for drugs. The following colloquy also took place:

"Q. Okay. And you knew where [Martin] was going to keep any drugs he may have been carrying as well, correct?

A. No, I didn't know. I saw him put them in his crotch before we walked out the door.

Q. So you found out where he would be keeping the drugs?

A. Yes.

Q. Did you know that that was a common place that he would keep them before, or was that just a one-time thing?

A. No, normally—actually, he keeps them in his pocket, but that day he was nervous so he, I guess, put them down there. We were walking out at 1:00 in the morning so I guess he wanted to conceal them.

Q. He also told you he owed someone money, right?

A. No, he did not.

Q. He never told you that while you guys were—let me back up. When you

- 4 -

guys were leaving Red's and you noticed someone following you, and [Martin] was nervous, right?

* * *

A. Oh, I'm sorry. Yes, I see where you're going with this, Ma'am, but that was the first statement that I gave to the detectives. The first statement I was falsifying information of course because I didn't want me or [defendant] to get in trouble for this. Then my second one I realized that it would have been much wiser just to tell the truth, so that's what I did.

Q. So in your first statement to the police you were lying?

A. Absolutely.

Q. But then in your second interview with police you were telling the truth?

A. Yes, Ma'am. That's exactly correct.

Q. And that was the same day, like immediately after your first interview?

A. Absolutely.

Q. You had a change of heart?

A. Yes, Ma'am, I did.

Q. Okay. And then in your third interview were you also telling the truth or were you lying in that interview?

A. There was no third interview. I had two interviews in one day and then the third was a follow-up, Ma'am.

Q. So you never gave a—so you did give a third interview, correct?

A. Yes, it was simple follow-up of questions though."

¶ 15    On further questioning, defense counsel also established that Trumbo had been a

confidential informant for approximately two months at the time of the incident. She had completed 12 controlled drug purchases with five different people and was doing so in the hope that her felony theft charge would be dismissed. Trumbo's relationship with defendant was complicated, but she had feelings for him and believed they were "[b]riefly" in a romantic relationship. Despite the fact that she was informing on defendant, she had sexual relations with him and knew that doing so was prohibited. Trumbo also stated that it was her decision to bleach defendant's clothes and then set them on fire. Moreover, she deleted text messages from her phone to "hide evidence."

¶ 16    Defense counsel then engaged in the following line of questioning:

"Q. So I want to go back to your first interview. In that interview you told police that an unknown male demanded money from [Martin] and jumped him, right?

A. Uh-huh.

Q. And you didn't know who that was? That's what you told police at the time, correct?

A. Absolutely, yes, Ma'am.

Q. And you described that person as a short, heavy-set male?

MR. FREDRICK [(ASSISTANT STATE'S ATTORNEY)]: I'm going to object to this line of questioning. In a sense it's an attempt to impeach when in actuality she's testified to what occurred.

THE COURT: Counsel, approach please.

***

MR. FREDRICK: My objection is that she's raising inconsistent statements

that she told during the first interview that she has not testified to here. So what [defense counsel] is attempting to do is impeach with statements she has not made in court that are not contradictory.

THE COURT: So it's in essence a hearsay objection and also foundation?

MR. FREDRICK: Yes.

THE COURT: [Defense counsel]?

MS. MANNEN [(DEFENSE COUNSEL)]: It's a statement by a party. She's the co-defendant in this case.

MR. FREDRICK: But it's not in furtherance of the act. It's after the fact.

THE COURT: Ms. Mannen?

MS. MANNEN: I can withdraw the question.

THE COURT: Okay.

\*\*\*

THE COURT: Objection sustained."

After withdrawing the question, defense counsel asked no further questions. Counsel renewed her assertion that the court erred in sustaining the objection in the posttrial motion.

¶ 17 On redirect examination, the prosecution asked whether Trumbo was "getting any consideration" for her testimony, and she said she was not. The prosecutor then asked Trumbo whether any promises had been made to her about any cases she had pending in consideration of her testimony, and she again answered in the negative.

¶ 18 2. *Testimony From Law Enforcement*

¶ 19 Testimony from various members of law enforcement established the following. Officers arrived on the scene after a report of shots fired. They found Martin lying on the ground,

bleeding. He had been shot in the shoulder and had additional cuts and bruises, including a cut above his eye. Photographs of his injuries were taken and submitted into evidence. When canvassing the area where Martin was shot, officers followed a blood trail to an area where they found a cell phone, along with other items, including a hat and a plastic bag with other smaller bags inside of it. Those bags field tested positive for cocaine. The cell phone was inventoried and later had the information extracted from it. Police also conducted extractions on Trumbo's and Martin's cell phones. When police went to Gunn's home, they found what were described as burn marks in the bathtub that were photographed and submitted as evidence.

¶ 20　　　　　Detectives determined that the cell phone found at the scene was defendant's based on text message content and interviews with Trumbo. The number for the cell phone found at the scene was not registered to any person. Trumbo had multiple contact names and numbers listed for defendant, and the contact listed as "Snake" had a number matching the phone found at the scene. When officers interviewed Gunn, he also had numerous contact names and numbers listed for defendant. None of the numbers for defendant in Gunn's phone matched the number of the phone found at the scene. The messages from the phone found at the scene were reduced to exhibits, admitted into evidence, and published to the jury. The messages included one from a contact by the name of Misty Jording, and it stated as follows:

> "Good morning, Stanley, I'm pretending to be having coffee with you right now. Lol. I have $60 for you if you want me to run it to you while I'm in town this morning. I sold the underground fencing for dogs to a customer that was in need of one. My MRI will probably take an hour."

Jording was subpoenaed and available to be called as a witness at trial but never testified.

¶ 21　　　　　The phone alleged to be defendant's also contained a number of messages to and

from the number associated with Trumbo. The first of these messages was sent from the phone found at the scene and stated "[m]y other phone is faked up. This is the other, ba. Anyway, r u available? I need to handle a few things." The next message to Trumbo stated,

> "Text me on this phone for right now. You know my other phone won't allow me to text the way I need to. Anyway, it's no rush, ba. I reacted to what u had said. I can come getcha if u change ur ming [*sic*]. I just wanted u next to me, beneath me, feel me. I'm only a breath away !!! Whisper my name and I will hear you no matter the distance between us."

¶ 22 There were also messages between defendant and Trumbo in the hour and a half before Martin was shot and robbed.

> Trumbo: (1:57 a.m.) "I'm like five minutes away from his house"
>
> Defendant: (1:57 a.m.) "OK ba."
>
> Trumbo: (2:05 a.m.) "Got here trying to get him out"
>
> Trumbo: (2:16 a.m.) "15 minutes"
>
> Trumbo: (2:17 a.m.) "Let's go"
>
> Defendant: (2:18 a.m.) "Onwards. What street r u traveling"
>
> Trumbo: (2:18 a.m.) "He has [it] in his pants scared spooked we heading out door not now"
>
> Trumbo: (2:18 a.m.) "Market"
>
> Trumbo: (2:20 a.m.) "Take the purse bag"
>
> Defendant: (2:20 a.m.) "Already know"
>
> Trumbo: (2:29 a.m.) "5 minutes"
>
> Trumbo: (2:29 a.m.) "Back Jeremy"

Defendant: (2:29 a.m.) "Gotchu"

¶ 23    A phone number associated with Gunn was also saved as a contact in defendant's phone under "Robbie." There were four calls between defendant and Gunn, and there were also text messages sent from defendant to Trumbo referring to "Robbie."

¶ 24    The extraction of Trumbo's phone did not include any texts with defendant, which was consistent with her testimony that she had deleted them. However, Trumbo's call history revealed three calls between Trumbo and the phone alleged to be defendant's in the days leading up to the robbery of Martin. The number associated with defendant's phone number was associated with a contact saved in Trumbo's phone under the name "Snake." The phone number associated with Gunn was also in Trumbo's phone.

¶ 25                    3. *Prior Conviction*

¶ 26    As part of the State's case, it was required to prove that defendant was a felon. Defense counsel stipulated to defendant's prior felony conviction, and the State submitted into evidence a certified copy of his prior felony conviction. The combined exhibit contained the record sheet, a detailed officer's version of the arrest, a nine-count indictment, plea agreement, and judgment of nine years in prison for a Class X unlawful delivery of a controlled substance conviction. All the jury was told about the exhibit was that it was a certified copy of defendant's 2015 felony conviction. The exhibit was never published to the jury and did not accompany the jury into the jury room during deliberations. The jury was instructed by the trial court to use the prior conviction for the sole purpose of determining whether defendant was a felon as required to prove the charge of unlawful possession of a weapon by a felon.

¶ 27                    4. *Closing Argument, Jury Instructions, and Verdict*

¶ 28    Defense counsel gave her closing argument, stating Trumbo was a drug addict with

multiple connections for obtaining drugs. She argued, "If any of those drug associates find out that she's a confidential source, she has some major trouble on her hands." Further, counsel stated, "[S]he's going to say what she has to say to save her skin. She was an unreliable confidential source at that." Counsel argued,

"[S]he was no longer a confidential source because she was having sexual relationships with multiple people that she was buying drugs from. She's just an unreliable witness. She's not a reliable confidential source. She's not a reliable witness. She's got a motive to lie. She has a motive to be biased."

Counsel also argued that it appeared Trumbo had set the whole robbery up and was the only person who could place defendant at the scene. Trumbo also did not turn her phone into police immediately afterward and had time to delete messages. Counsel further stated, "[W]ho knows what else she did to tamper with that phone." Counsel also argued, "[W]hat we do know is that she does not have any problem tampering with evidence, she doesn't have a problem tampering with cell phones."

¶ 29    In conclusion, counsel once again stated,

"We don't have an identification of [defendant] except for from [Trumbo], the person who's unreliable, a known liar, and somebody who changed her story to the police multiple times. She tampered with evidence. She admitted to doing so. She admitted to burning the clothes, admitted to bleaching the clothes. We know she's not afraid to lie. We know she's not afraid to do what she has to do to save her own skin."

¶ 30    Among the instructions the trial court gave to the jury before sending it to deliberate was the following: "When a witness says he was involved in the commission of a crime with the

defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." The jury ultimately acquitted defendant on the obstruction of justice charge and found him guilty of all remaining charges. The matter proceeded to sentencing.

¶ 31                    B. Posttrial Complaints of Ineffective Assistance of Counsel

¶ 32            At the sentencing hearing, defendant read from a letter to the trial court stating the numerous ways in which he felt trial counsel was ineffective. The court then held a *Krankel* hearing. Defendant claimed that while in La Salle County jail, Trumbo confessed to him via text message that she "involved [him] in all of this chaos" because she had seen messages on his phone suggesting conversations with other women. Trumbo said she had attempted to contact defendant's previous attorney and provide an affidavit to this effect. Defendant provided the numbers from which Trumbo texted him to trial counsel so that the message could be obtained. He also asserted that someone named Nakia Prather would testify to Trumbo's admissions after his arrest. Defendant also asserted that (1) Trumbo's child's father was also named Stanley and (2) Trumbo's phone was in possession of others before it was turned over to police for reexamination.

¶ 33            In examining defendant's assertions, the trial court asked for a response from defense counsel regarding the various allegations of deficient performance. Generally, counsel asserted that the issues raised by defendant were either not relevant at trial, unable to be verified, or inconsistent with defense trial strategy. Regarding the text messages between Trumbo and defendant, counsel stated that she had submitted the phone numbers given to her by defendant to La Salle County jail and had received and reviewed all the messages. Counsel declined to use the messages because the chosen trial strategy was to mount an identity defense, and the messages "were not going to be of any assistance or furtherance of the trial strategy." In referencing other

- 12 -

possible impeachment evidence defendant wanted used at trial—including the allegation Trumbo has having sex with her police handler—counsel stated that she "had other impeachment evidence" that "was more powerful" and that certain claims could not be verified.

¶ 34        In finding that defendant's complaints of ineffective assistance of counsel did not warrant the appointment of counsel, the trial court addressed several of the contentions individually before finding that they lacked merit. The court concluded that the remaining allegations not specifically addressed were "just an itemization of conclusions that [defense counsel] didn't do this, she didn't do that, and not specific allegations or assertions."

¶ 35        The matter proceeded to sentencing, and the trial court imposed an aggregate sentence of 62 years' imprisonment. This appeal followed.

¶ 36                                II. ANALYSIS

¶ 37        Defendant argues that his trial counsel was ineffective in failing to seek severance of the charge of unlawful possession of a weapon by a felon and in inadequately cross-examining Trumbo, including the failure to impeach her with the use-immunity agreement. Defendant also argues that the cumulative effect of the errors requires reversal. Finally, he argues that the trial court conducted an inadequate preliminary inquiry into his claims of ineffective assistance under *Krankel*, specifically related to his claims that (1) Trumbo attempted to contact his previous attorney and provide an affidavit, (2) Trumbo's child's father is also named Stanley, (3) Prather would testify to admissions by Trumbo after defendant's arrest, and (4) Trumbo's phone was in possession of others before it was turned over to police for reexamination. We address each contention in turn.

¶ 38                            A. Assistance of Counsel

¶ 39        "The United States and Illinois Constitutions guarantee criminal defendants the

right to the effective assistance of counsel." *People v. Lewis*, 2022 IL 126705, ¶ 44 (citing U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984)). The familiar two-part test established in *Strickland* and adopted by Illinois (see *Albanese*, 104 Ill. 2d at 525-26) requires a defendant to show that defense counsel's assistance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. See *People v. Johnson*, 2021 IL 126291, ¶ 52. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the trial." *People v. Houston*, 229 Ill. 2d 1, 4 (2008). A defendant must establish both deficient performance and prejudice, and a reviewing court's finding that the defendant cannot establish one of those required predicates obviates review of the other. See *People v. Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland*, 466 U.S. at 697). "Whether counsel is ineffective is a question of law subject to *de novo* review." *People v. Brown*, 2024 IL 129585, ¶ 29.

¶ 40                                        1. *Severance*

¶ 41        We turn first to defendant's assertion that counsel was ineffective for failing to seek severance of the charge of unlawful possession of a weapon by a felon. To establish deficient performance of counsel, a defendant must overcome the strong presumption that counsel's actions were the product of sound trial strategy. *People v. Webb*, 2023 IL 128957, ¶ 22. "Generally, a defense decision not to seek a severance, although it may prove unwise in hindsight, is regarded as a matter of trial strategy." *People v. Poole*, 2012 IL App (4th) 101017, ¶ 10. To that end, it is recognized that trial counsel may choose to pursue an "all or nothing" strategy at trial; attempting to secure an acquittal on all charges rather than pursuing piecemeal litigation. See *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 28. A recognized disadvantage of severance is that it provides the

State "two bites at the apple," providing an opportunity for a defect or insufficiency at the first trial to be cured in the second. *Poole*, 2012 IL App (4th) 101017, ¶ 10.

¶ 42     Defendant relies on several cases, including *People v. Edwards*, 63 Ill. 2d 134 (1976), *People v. Bracey*, 52 Ill. App. 3d 266 (1977), *People v. Strong*, 215 Ill. App. 3d 484 (1991), *People v. McMillin*, 352 Ill. App. 3d 336 (2004), *People v. Williams*, 164 Ill. App. 3d 99 (1987), *People v. Johnson*, 2013 IL App (2d) 110535, and *People v. Utley*, 2019 IL App (1st) 152112. However, we find those cases distinguishable from the instant matter. *McMillin*, *Williams*, *Johnson*, and *Utley* all involved a scenario where defense counsel failed to stipulate to the prior felony, the jury was told the nature of the felony, and the jury did not receive a limiting instruction on the proper use of the prior felony. *McMillin* involves a particularly egregious instance where defense counsel chose to highlight the defendant's lengthy criminal past in an effort to show that he was being honest despite his past. *McMillin*, 352 Ill. App. 3d at 346. The appellate court opined that it was an "unsound strategy to inform a jury that the accused is a perpetual outlaw who has engaged in a decade of criminal activity." *Id. Edwards* is not on point because counsel there *did* move for severance, and the issue before the Illinois Supreme Court was whether the trial court erred in denying the motion, obviating considerations of trial strategy. *Bracey* and *Strong* involved circumstances like *Edwards*, where defense counsel actually moved for severance but was denied by the trial court. *Bracey*, 52 Ill. App. 3d at 272-73; *Strong*, 215 Ill. App. 3d at 486.

¶ 43     Rather, as we have previously found, the reasoning of *Poole* and *Fields* is on point. See, *e.g.*, *People v. Wright*, 2023 IL App (4th) 220499-U, ¶ 80. Here, defense counsel pursued an all or nothing strategy, deciding to try all charges at once. Counsel presented a defense that the person who robbed and beat Martin was not defendant and the testimony from the State's key witness (Trumbo) was riddled with credibility issues. Additionally, counsel was able to secure a

very favorable stipulation, whereby the jury heard that defendant had a prior felony conviction in 2015, but the jury did not hear what the charge was or any details surrounding the conviction. We find that this was a reasonable trial strategy. Moreover, the jury was also instructed that it could use the information of the prior felony only in regard to establishing defendant's felon status for purposes of the charge of unlawful possession of a weapon by a felon, reducing any potential prejudice to defendant.

¶ 44　　　　Defendant also points to defense counsel's reasoning in suggesting that defendant not testify. He argues that this cuts against the argument of trial strategy for an all or nothing approach. We disagree. Counsel was able to obtain a stipulation to a single, nondescript felony offense, the details of which were never revealed to the jury. On the other hand, if defendant were to testify, the State might impeach him with more than just one of his felony convictions in order to diminish his credibility. Once again, we find that this was a reasonable trial strategy and not inherently contradictory.

¶ 45　　　　In sum, defendant has not overcome the strong presumption that trial counsel's decision to forgo a request to sever the charges was a matter of trial strategy. Consequently, this matter of trial strategy cannot serve as the basis for a claim of deficient performance by defendant's trial counsel.

¶ 46　　　　　　　　　　　　　2. *Cross-Examination of Trumbo*

¶ 47　　　　Next, defendant contends that counsel was ineffective when she withdrew a question during the cross-examination of Trumbo. The following exchange occurred when defendant's counsel was establishing that Trumbo had fabricated a series of events during her first interview with police:

　　　　　　　"[DEFENSE COUNSEL]: So I want to go back to your first interview. In

that interview you told police that an unknown male demanded money from [Martin] and jumped him, right?

[TRUMBO]: Uh-huh.

Q. And you didn't know who that was? That's what you told police at the time, correct?

A. Absolutely, yes, Ma'am.

Q. And you described that person as a short, heavy-set male?"

The State objected, as the prosecutor believed the line of questioning was improper impeachment because Trumbo had not previously testified to the statements made during the first interview. Defense counsel argued that Trumbo was a codefendant, so her statements during the first interview were statements by a party. The State asserted it was not in furtherance of the act. Defense counsel ultimately withdrew the question, and the trial court sustained the objection.

¶ 48    On appeal, the parties argue over the propriety of counsel's withdrawal of her question. Defendant argues Trumbo's statements during her first interview were admissible as a "statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Ill. R. Evid. 801(d)(2)(E) (eff. Jan. 1, 2011). The State argues that there is a stark contrast between using those prior statements against a defendant and the testifying coconspirator.

¶ 49    In our view, the issue may not be as complicated as either side seems to make it. Trumbo was a witness against defendant who testified that he committed the criminal acts at issue. It is fundamental that a witness may be impeached by the making of a prior inconsistent statement, and the first step toward doing so is to ask the witness if such a statement was made. See *People v. Henry*, 47 Ill. 2d 312, 321 (1970) (noting that the purpose of so examining the witness is to prevent "unfair surprise and to provide an opportunity to *** explain the statement with which he

- 17 -

is confronted"); see also Ill. R. Evid. 801(d)(1)(A) (eff. Jan. 1, 2011). That is exactly what occurred here, as counsel asked Trumbo about the first statement made to police in which she incriminated neither herself nor defendant. Trumbo flatly admitted that in her first statement, she was "falsifying information of course because I didn't want me or [defendant] to get in trouble."

¶ 50 Counsel's cross-examination elicited Trumbo's admission that she lied to police in her first statement. From that point, any further examination would only explore the specific details of Trumbo's false first statement. For example, the only specific question that counsel withdrew was one asking whether Trumbo had described the assailant as "a short, heavy-set male," presumably because defendant does not match that description. Having elicited Trumbo's acknowledgement that she had made a prior inconsistent statement to police, it was a matter of trial strategy whether to seek to elicit further false details from her initial statement; this is surely a matter of diminishing returns. See *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 83 ("Whether and how to conduct a cross-examination is generally a matter of trial strategy."). We find that the failure to press on with more questions about the statement already admitted to have been false does not constitute ineffective assistance of counsel.

¶ 51 We also conclude that defendant was not prejudiced by his attorney's failure to seek more details about Trumbo's initial statement. The proper basis to examine Trumbo about the prior inconsistent statement was to impeach the credibility of her trial testimony inculpating defendant. Here, however, the bases for impeachment of Trumbo in the record are many and varied. The jury was made well aware of Trumbo's credibility issues, as counsel established on cross-examination that Trumbo was addicted to cocaine; engaged in the practice of exchanging sex for drugs with multiple people; continued this practice while being in a relationship with defendant; was a confidential informant for police because of a prior felony theft charge; broke the terms of her

confidential informant agreement by engaging in a sexual relationship with defendant while informing on him; helped defendant plan the robbery of Martin; and concocted a false story in her first interview with police. Moreover, counsel established that Trumbo was "drunk" during both interviews. During closing argument, counsel drove home her point that Trumbo was a "known liar" with a "motive to lie," was an "unreliable witness," and was "not afraid to do what she has to do to save her own skin." We cannot find that defendant was prejudiced by counsel choosing not to explore each detail of the initial statement, nor do we assume that the trial court would have permitted exhaustive inquiries about a statement acknowledged to be false. See *People v. Criss*, 294 Ill. App. 3d 276, 279 (1998) (noting a court "may not deprive a defendant of the right to question witnesses," but "it may limit the scope of cross-examination").

¶ 52      Accordingly, defendant can establish neither deficient performance nor prejudice from his attorney's withdrawal of the question at issue.

¶ 53                                3. *Use Immunity*

¶ 54      Similar to the argument above, defendant argues that defense counsel should have impeached Trumbo with a use-immunity agreement provided by the State in order to secure her testimony. "Under the fifth amendment [(U.S. Const., amend. V)], a witness in a criminal case may refuse to answer questions which might incriminate him when he has reasonable cause to believe he might subject himself to prosecution if he answers." *People v. Ousley*, 235 Ill. 2d 299, 306 (2009). To overcome this obstacle here, Trumbo was granted immunity for her testimony. "Where a grant of immunity is given, the prosecutor has the right to demand and expect the witness's testimony, even under compulsion by the court if necessary." *People v. Evans*, 2016 IL App (3d) 140120, ¶ 47.

¶ 55      The type of immunity granted to Trumbo was use immunity, which means that the

State could not utilize her testimony, or evidence obtained as a result of it, in a subsequent prosecution against her. 725 ILCS 5/106-2.5(b) (West 2024). This differs from transactional immunity, which if granted to Trumbo, would have completely immunized her from future prosecution related to the subject of the agreement. *People v. Adams*, 308 Ill. App. 3d 995, 1004 (1999). To be clear, this is not an agreement between Trumbo and the State, but an order entered by the trial court at the State's request. The effect of the order was to strip Trumbo of her constitutional right against self-incrimination. Consequently, the extension of use immunity to Trumbo did not directly "benefit" her, but it removed her ability to choose not to testify. This is different from an agreement immunizing her against future prosecution or limiting that prosecution or sentence. As defendant points out, Trumbo was subsequently convicted on the armed robbery charge and received a 20-year sentence. See *Cordrey v. Prisoner Review Board*, 2014 IL 117155, ¶ 12 n.3 (noting that a court can take judicial notice of records of the Department of Corrections).

¶ 56        Impeachment of a witness is considered a matter of trial strategy, thereby generally immune from claims of ineffective assistance of counsel. *People v. Phillips*, 2017 IL App (4th) 160557, ¶ 58. A mistake in trial strategy or an error in judgment by defense counsel will not render the representation so ineffective as to be constitutionally defective. *People v. Peterson*, 2017 IL 120331, ¶ 80. "A defendant may rebut the presumption of trial strategy by showing that counsel's failure to impeach a witness was so unreasonable that no effective defense attorney would have pursued the strategy." *People v. Zambrano*, 2016 IL App (3d) 140178, ¶ 24.

¶ 57        Here, counsel's decision not to inject Trumbo's use-immunity agreement into the case was a rational strategic decision. First, as discussed above, the "benefit" to Trumbo—such that it might incentivize her to craft her testimony a certain way—is much less patent in the case of use immunity. It is true that she was required to testify truthfully, and she may well have reason

to think that the State's belief in a particular series of events as being the benchmark of truthful testimony. Even then, however, informing the jury of Trumbo's use-immunity agreement is a double-edged sword. As the State points out,

> "[r]evealing that Trumbo was testifying under a use-immunity agreement would not add new reasons for distrusting Trumbo, but it would give the State the opportunity to clarify on re-direct that Trumbo's only requirement under the agreement [was] to tell the truth and Trumbo's only benefit is not having these statements used against her."

¶ 58       Moreover, it would be unreasonable to assume that more is always better; it is implicitly the role of counsel to decide when enough is enough and when piling on is too much. As laid out above, Trumbo's credibility was significantly impugned during cross-examination, and the jury knew of her role as a police informant. See *People v. Douglas*, 2011 IL App (1st) 093188, ¶ 47 ("[A] court of review will not upset a verdict by a jury on the possibility, not probability, that with a little bit more impeachment, the witness would have been found totally incredible.").

¶ 59       We judge it important to avoid a situation in which whatever counsel chooses to do is wrong. If counsel had brought the use-immunity agreement to light even though it would permit the State to bolster Trumbo's testimony by pointing to her obligation to tell the truth, might that not also create an argument that counsel's choice rendered her ineffective? This demonstrates most clearly that there are pluses and minuses to choosing either path, so counsel's decision is inherently a matter of trial strategy. As defense counsel explained at the preliminary *Krankel* inquiry, there were substantial amounts of impeachment evidence, and she had to decide what evidence was worth introducing. We reject defendant's claim that his attorney was ineffective for choosing not to bring the use-immunity agreement to the jury's attention.

¶ 60                                    4. *Cumulative Error*

¶ 61            Defendant asserts that even if none of the individual claims of ineffective assistance of counsel entitles him to reversal, cumulatively, they do. The doctrine of cumulative error, in general, is that even when individual errors cannot afford defendant relief, if the overall effect of those errors serve to deny a defendant a fair trial, reversal is warranted. *People v. Quezada*, 2024 IL 128805, ¶ 46. Defendant takes a leap by assuming that "cumulative error" is applicable to questions of ineffectiveness, as opposed to trial court errors. At best, it may be relevant to the prejudice analysis under *Strickland*.

¶ 62            Regardless, we have found that the performance of defendant's trial counsel was not deficient. Even if we were to transplant the concept of "cumulative error" into our *Strickland* analysis, we would note that there must be at least one instance of deficient performance to apply the concept of cumulative error. See *id.* ("Cumulative error can arise only from actual trial errors."). We find no deficient performance has occurred, so there can be no cumulative impact of deficient performance.

¶ 63                                    B. *Krankel* Inquiry

¶ 64            Defendant's final argument is that the trial court's preliminary *Krankel* inquiry into certain aspects of his posttrial claims of ineffective assistance of counsel was insufficient. When a defendant presents *pro se* claims of ineffective assistance of counsel posttrial, a trial court is obligated to engage in the common law procedure articulated in *Krankel*. *People v. Jolly*, 2014 IL 117142, ¶ 29. The initial step in this procedure is to examine the factual basis of the claims to determine if they lack merit or relate to matters of trial strategy. *Jackson*, 2020 IL 124112, ¶ 97. If the claims relate to strategy or lack merit, the court need not appoint new counsel to further develop the claims and may deny the motion; if the claims show possible neglect of the case, new counsel

should be appointed. *Id.* "[T]he primary purpose of the preliminary [*Krankel*] inquiry is to give the defendant an opportunity to flesh out his claim of ineffective assistance so the court can determine whether appointment of new counsel is necessary." *People v. Ayres*, 2017 IL 120071, ¶ 20. This is meant to let the trial court decide, in the first instance, whether to appoint new counsel to argue a defendant's *pro se* posttrial ineffective assistance claim. It is also intended to promote consideration of those claims in the trial court in order to limit issues on appeal. *Jackson*, 2020 IL 124112, ¶ 95. " 'The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel.' " *Id.* ¶ 98 (quoting *People v. Moore*, 207 Ill. 2d 68, 78 (2003)).

¶ 65    During the evaluation in the trial court,

> "some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim. Trial counsel may simply answer questions and explain the facts and circumstances surrounding the defendant's allegations. [Citations.] A brief discussion between the trial court and the defendant may be sufficient. [Citations.] Also, the trial court can base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 78-79.

" 'Where a defendant's claims are conclusory, misleading, or legally immaterial, or do not bring to the trial court's attention a colorable claim of ineffective assistance of counsel, the trial court may be excused from further inquiry.' " *People v. Thornton*, 2024 IL App (4th) 220798, ¶ 74

(quoting *People v. Bobo*, 375 Ill. App. 3d 966, 985 (2007)).

¶ 66    Whether a trial court conducted an adequate preliminary inquiry is a matter we review *de novo*; however, if the court conducted an inquiry and resolved the defendant's claims, our review is for manifest error. *Jackson*, 2020 IL 124112, ¶ 98. "Manifest error is error that is clearly evident, plain, and indisputable." *Id.*

¶ 67    Specifically, defendant argues that the trial court failed to adequately inquire into his allegations that (1) Trumbo attempted to contact his previous attorney and provide an affidavit that contained the same admissions provided in text messages reviewed by trial counsel, (2) Trumbo's child's father is also named Stanley, (3) Prather would testify to the same admissions made in text messages by Trumbo after his arrest, and (4) Trumbo's phone was in possession of others before it was turned over to police for reexamination. We agree with the State that when the court ruled that the certain contentions were "just an itemization of conclusions that [defense counsel] didn't do this, she didn't do that, and not specific allegations or assertions," it was in reference to these allegations.

¶ 68    The argument that counsel failed to assert that Trumbo's phone was in the possession of others before being reexamined by police does not suggest ineffectiveness of counsel. At trial, Trumbo testified that she herself manipulated the information in her phone before giving it to police. The failure to argue that the phone was manipulated by others after it had already been reviewed by police the first time does not suggest deficient performance by counsel.

¶ 69    Regarding the alleged attempt to provide an affidavit and testimony from Prather involving the same admissions Trumbo made via text, defense counsel stated that she had obtained all of those messages, reviewed them, and found the messages had no evidentiary value to the chosen trial strategy. Consequently, testimony or an affidavit to the same effect would simply be

changing the manner of introducing the same evidence counsel found would not further the defense theory of the case. As we have noted, the way in which counsel chooses to impeach a witness is a matter of trial strategy, as is who counsel calls to testify. Moreover, the written letter notes that Prather could have "testified to the 'intimacies' shared between she and Trumbo after [defendant's] arrest." Establishing that Prather and Trumbo shared intimacies would not have furthered defendant's chance of acquittal, as counsel had already established that Trumbo was not discerning in her sexual partners or the reasons for such intimacies.

¶ 70 There was also the allegation that the father of Trumbo's child shared the same name as defendant, Stanley. The only possible relevance of this point is that somehow the "Stanley" identified in text messages was not defendant, but some other person sharing the same name. However, Trumbo's phone identified defendant's contact information as "Snake," and there is no suggestion that this refers to some other person with that nickname. There was a reference to "Stanley" in one of the texts located on the phone found at the scene, but defendant does not offer any reason to think that *Jording* was referring to the father of Trumbo's former child. We note that the State had subpoenaed Jording and placed her on its witness list; she was ready to testify but was never called. It is apparent that instead of proceeding with this argument as articulated by defendant and pushing the State to put Jording on the stand to testify she was texting defendant, counsel instead chose to attack the credibility of Trumbo, the person who tied defendant to that phone. This is a matter of trial strategy and does not suggest possible deficiency in counsel's performance.

¶ 71 Defendant cites numerous cases to support the assertion that the trial court here conducted an inadequate inquiry into defendant's allegations of ineffective assistance. See, *e.g.*, *People v. Rhodes*, 2019 IL App (4th) 160917, ¶ 20. However, the majority of cases cited by

defendant involve situations where the court failed to conduct an inquiry at all. Defendant also filed a motion to supplement authority, citing *People v. Woods*, 2026 IL App (4th) 241142-U. In *Woods*, we found that

> "[a]lthough the court understood the need to conduct the inquiry and allowed [the] defendant to speak at length, it failed to ask defense counsel any specific questions regarding the factual basis of claims that were based on facts outside of the record. The court also appeared to rely on erroneous facts." *Id.* ¶ 64.

Here, the trial court posed specific questions to defense counsel to establish why she did not use certain evidence, and it did not rely on erroneous facts. Despite defendant's claims that we do not know what the testimony of Prather or the affidavit of Trumbo would establish, it was clear from defendant's answers that the information would have been the same as the text messages reviewed and disregarded by counsel as offering no assistance to trial strategy. Defendant clearly articulated that Trumbo made admissions in these messages and that the information he sought from other sources would only reiterate that information.

¶ 72    Accordingly, it is not clearly evident, plain, or indisputable that the trial court erred in denying defendant's posttrial claims of ineffective assistance of counsel. "Defendant's allegations were either matters of trial strategy or unfounded claims." *People v. Roddis*, 2020 IL 124352, ¶ 67.

¶ 73                                 III. CONCLUSION

¶ 74    For the reasons stated, we affirm the trial court's judgment.

¶ 75    Affirmed.